*452 OPINION OF THE COURT
Alexander Chananau, J.
This negligence action is brought on behalf of the infant plaintiff, Dina A. Sorichetti, against the City of New York to recover damages resulting from the multiple, mutilating and disfiguring injuries inflicted on her by her father, Frank D. Sorichetti, on November 9, 1975, when she was six years old. Derivative actions for resultant loss of services and damages are also brought by the infant’s mother, Josephine Sorichetti. The basis for the claims is the alleged negligence of the defendant, the City of New York, in failing to protect the infant and in failing to arrest Frank Sorichetti and take him into custody for violating a final order of protection issued to Josephine Sorichetti on November 6, 1975 by the Family Court of the State of New York, City of New York, County of the Bronx. The defendant, contending that the aforesaid Family Court order was issued to and limited solely for the protection of the mother, moves to dismiss the action pursuant to CPLR 3211 (subd [a], par 7) for failure to state a cause of action.
The facts herein either are conceded or are not seriously disputed and, in any event, the defendant contends that “Assuming arguendo that all that will be alleged is true, * * * dismissal is still mandated. No duty was owed to Dina Sorichetti by the defendant municipality.”
Prior to November 8, 1975 Frank Sorichetti was known to the defendant’s police officers at the 43rd Precinct, having previously been arrested by them approximately six times for drunkenness, abusive and physical assault upon his family. Frank Sorichetti’s police records, including his arrest and complaint records, maintained in the 43rd Precinct corroborated his vicious propensities and his prior assaults.
In July, 1975 Frank Sorichetti assaulted his wife with a knife, inflicting lacerations which required suturing at Jacobi Hospital; she thereafter brought a divorce action, which resulted in further violence by Frank Sorichetti and threats by him that he would kill her and the children if she proceeded with the divorce action. Josephine Sorichetti thereupon went into the Family Court where, on September 18, 1975, she obtained a preliminary order of protection against her husband; thereafter, on November 6, 1975 the order was finalized for one year and, over her strenuous objections, was amended *453 to grant to Frank Sorichetti visitation with Dina from 10:00 a.m. on Saturdays to 6:00 p.m. on Sundays. After the parties left the courtroom on November 6, Frank Sorichetti attempted to assault his wife and he had to be restrained by a court officer. The Family Court Judge was informed of the incident and thereupon directed the court officer to get Frank Sorichetti out of the building; however, the Judge did not rescind Frank Sorichetti’s weekend visitation with the infant.
In accordance with the provisions of the Family Court Act, a "Certificate of Order of Protection” was duly issued to Josephine Sorichetti by the clerk of that court on November 6, 1975 certifying that an order of protection had been issued to her, pursuant to which Frank Sorichetti was "forbidden to assault, menace, harass, endanger, threaten or act in a disorderly manner toward petitioner and * * * [he] is to remain away from the home of said petitioner.”
The certificate issued to Josephone Sorichetti further recited, pursuant to statute: "and it is provided by law that the presentation of this Certificate to any Peace Officer shall constitute authority for said Peace Officer to take into custody the person charged with violating the terms of such Order of Protection and bring said person before this Court and otherwise, so far as lies within his power, to aid the Petitioner in securing the protection such Order was intended to afford.”
As provided in said order of protection, Frank Sorichetti was directed to remain away from Josephine Sorichetti’s home and the parties were told by the Family Court that the infant was to be delivered and picked up at the 43rd Precinct.
Two days later, on Saturday, November 8, Josephine Sorichetti took the infant to the 43rd Precinct to accord Frank Sorichetti his weekend visitation. Frank Sorichetti took the infant and, as he was walking away, he made a death threat against his wife, Josephine Sorichetti, and the infant, Dina Sorichetti, and he indicated to Josephine that before the weekend was up she would be making "the sign of the cross” which to them meant that there would be a death. Josephine Sorichetti immediately went into the precinct and told the desk officer of the death threats to herself and the infant; she showed the desk officer the certificate of order of protection; she advised him of her fears and told him that she was frightened for the safety of her child and herself and that the order of protection protected her from such threats and she requested the police to take Frank Sorichetti into custody for *454 violating said order. However, the police refused to do anything whatsoever.
The next day, Sunday, November 9, at 5:30 p.m., Josephine Sorichetti returned to the 43rd Precinct where she spoke successively to Police Officer Lo Bello and then to Lieutenant Gránelo, and she repeated to each of them the events of the day before, including the death threats by Frank Sorichetti against her daughter and herself; she told them of her fears and she showed each of them the certificate of order of protection issued to her by the Family Court. She repeated her demand that they arrest Frank Sorichetti for violation of the order of protection and that they dispatch a police car to his apartment to pick up the infant. The police again refused to do anything, telling her to wait outside for Frank Sorichetti to bring the infant back.
Frank Sorichetti failed to return the infant at 6:00 p.m., as required by the order of protection. Josephine Sorichetti again went into the station house and she again spoke to Lo Bello and Gránelo and she again demanded that the police arrest her husband for violating the order and protect the infant; once again the police refused to do anything whatsoever and Gránelo told her to wait a couple of hours and that "perhaps” Frank Sorichetti had taken the infant to a movie. Josephine Sorichetti continued her vigil and continued to wait in front of the precinct. Thereafter, on three separate occasions she returned inside the precinct to plead with the police for help; on each occasion she repeated the threats against their lives which had been made by Frank Sorichetti, as well as repeating the various incidents and assaults previously perpetrated by him and each time she showed the police the certificate of order of protection, stating each time that the order of protection had been violated by Frank Sorichetti and each time demanding that the police act to protect the infant. The police continued their refusal to do anything. In fact, Lieutenant Granelo’s response, after seeing the certificate, was "So what, what have you got there, they mean nothing.” Gránelo, however, offered Josephine Sorichetti the gratuitous advice that in all probability the infant had been returned to her apartment. At about 6:30 p.m., one-half hour after Frank Sorichetti was required to but failed to return the infant, Gránelo graciously permitted Josephine Sorichetti to use the precinct telephone to call home, where her girlfriend was waiting; the infant had not been returned and Josephine Sorichetti so informed Gra *455 nelo and she again requested that the police send a car to Frank Sorichetti’s apartment to pick up the infant and arrest Frank Sorichetti, but all to no avail. Josephine Sorichetti continued to wait at the precinct until about 7:00 p.m. and when the infant was not returned by then, Gránelo advised her to go home and stay there and that in all probability the infant would be returned there. Josephine Sorichetti was finally convinced that the police would not comply with the command in the certificate of order of protection and would not do anything at all to assist her or to protect the infant and she returned home after leaving her telephone number with Gránelo in the event the infant was brought back to the precinct.
Thereafter, and sometime after 7:00 p.m., on November 9, Frank Sorichetti’s sister entered his apartment at 2156 Cruger. Avenue, which is located in the 43rd Precinct. She found him lying on the floor with an empty whiskey bottle and an empty pill bottle lying beside him. She also found the infant, who had been viciously attacked, mutilated and severely injured by her father and she telephoned the police. Sorichetti had attacked the infant at about 7:00 p.m. with a fork, a knife and screwdriver; he had attempted to saw her leg off with a saw; she had been slashed from head to toe and she had sustained severe multiple internal injuries. Minutes later police officers from the same 43rd Precinct arrived and they rushed the infant to Jacobi Hospital in their police car, without waiting for an ambulance; the infant was immediately taken into surgery and she was operated on until approximately 2:00 a.m. the following day. The infant was in a coma for several days and she remained in a critical condition for approximately three weeks and was hospitalized until December 19, 1975 (40 days). Dina Sorichetti remains severely and permanently disabled.
Frank Sorichetti was arrested after the attack on the infant and he was thereafter indicted by the Grand Jury, tried and found guilty of attempted murder of the infant and he is now serving a jail sentence for the crime.
The defendant’s motion is based on a simplistic, limited interpretation of the order of protection, to wit, that it was solely for the protection of Josephine Sorichetti and that since Josephine Sorichetti "was never touched, attacked or assaulted,” it (defendant) cannot be held liable. The defendant contends "That tort liability can exist only where there has *456 been some relationship on the part of the municipality to the [infant] plaintiff” (citing Shuster v City of New York, 5 NY2d 75); and that "absent special circumstances there is no duty upon a municipality to provide police protection” (citing Riss v City of New York, 27 AD2d 217).
In considering a motion to dismiss for failure to state a cause of action the pleadings must be liberally construed and the allegations assumed to be true (Cohn v Lionel Corp., 21 NY2d 559); the court assumes the most favorable view of the facts in support of the plaintiffs’ action (Patterson v Proctor Paint & Varnish Co., 21 NY2d 447). A motion to dismiss should not be granted unless it is very clear that there can be no relief under any of the facts alleged in the pleadings for the relief requested or other relief. (Richardson v Coy, 28 AD2d 640.) And when the moving party offers matter extrinsic to the pleadings, the criterion to be applied is whether the plaintiff actually has a cause of action, not whether he has properly stated one (Rappaport v International Playtex Corp., 43 AD2d 393).
By the time Schuster v City of New York (5 NY2d 75, supra) reached the Court of Appeals, a variety of cases had held municipalities liable both for nonfeasance as well as misfeasance in the exercise of the police power.
"Municipalities have been held liable to a bystander negligently shot by a policeman engaged in an altercation with another (Wilkes v. City of New York, 308 N.Y. 726); to a taxicab driver shot by a passenger negligently placed in his cab by policemen (Lubelfeld v. City of New York, 4 N Y 2d 455); to the estate of an arrested man who died from pneumonia caused by exposure in the jail and failure to treat a fractured hip and elbow (Dunham v. Village of Canisteo, 303 N.Y. 498); to the estate of a man negligently shot by a policeman for making a disturbance while intoxicated (Flamer v. City of Yonkers, 309 N.Y. 114); to the estate of a man arrested for public intoxication who died from cerebral hemorrhage in consequence of failure of the police to procure medical aid (O’Grady v. City of Fulton, 4 N Y 2d 717); to a wife shot by her husband to whom the police had negligently returned a pistol (Benway v. City of Watertown, 1 A D 2d 465); and to a bystander injured while directing traffic at the instance of a police officer (Adamo v. P. G. Motor Freight, 4 A D 2d 758). In McCrink v. City of New York (296 N.Y. 99) a city was held liable for negligently having omitted to dis *457 charge a police officer by whom plaintiffs intestate was shot. In Meistinsky v. City of New York (309 N.Y. 998) the estate of a holdup victim recovered who had been killed by an untrained officer’s bullets. Negligence of the city was found in its omission to use reasonable care in training the police officer so that he could shoot straight and hit the criminal instead of his victim. None of these actions could have been brought until after the waiver of governmental immunity by section 12-a (now § 8) of the Court of Claims Act (Bernardine v. City of New York, 294 N.Y. 361), but in each of them liability arose from negligence of a city in the exercise of the police power, and in at least two of them the negligence consisted in nonfeasance rather than in misfeasance (McCrink v. City of New York, supra; Meistinsky v. City of New York, supra).” (Schuster v City of New York, supra, pp 81-82.) In Schuster the plaintiffs intestate was murdered after he had supplied the police with information leading to the arrest of a well-known, dangerous fugitive from justice. After the decedent’s part in the capture was widely publicized he immediately received communications threatening his life, of which he notified the police. Three weeks later Schuster was shot and killed while approaching his home in the evening. The subsequent action by Schuster’s father raised the issue of municipal liability for failure to provide adequate police protection once it reasonably appeared that the decedent was in danger. The Court of Appeals reversed the Appellate Division (286 App Div 389) which had affirmed the dismissal of the complaint by Special Term, and denied the defendant’s motion to dismiss the complaint, stating at page 86: "The instant action is based on negligence. It is grounded on negligence of the police in the failure to exercise reasonable care for the protection of Schuster after he had received threatening letters”.
In Jones v County of Herkimer (51 Misc 2d 130), the plaintiffs decedent, a resident of the Village of Ilion was shot and killed by a resident of the Village of Frankfort in the village’s offices, where she had taken refuge. The assailant had previously made threats against the decedent, had annoyed her and had assaulted her.
Following one such assault a meeting was held in the private law office of the Herkimer County District Attorney and during the course of that meeting the assailant struck the decedent and her father for which assaults he was convicted; sentence was suspended and he was placed on probation for *458 two years. Despite this, however, the assailant continued to threaten, harass and annoy the decedent until he shot and killed her on August 27, 1964. An action was brought for wrongful death, alleging that decedent’s death was caused wholly through the negligence of defendants’ and/or their agents and employees. It was alleged that the Villages of Ilion and Frankfort had knowledge of the fact that the assailant had been placed on probation on March 13, 1964, after having been convicted of assaulting the decedent and her father in February, 1964; that while on probation and prior to August 27, 1964, they knew that, despite his probation he continued to threaten the decedent and menace her life; that this conduct was communicated on a number of occasions to the defendant villages and that they refused to take any affirmative steps to revoke the assailant’s probation.
Upon these facts, as revealed in the pleadings, the defendant, Village of Frankfort, moved to dismiss the complaint, pursuant to CPLR 3211 (subd [a], par 7), for failure to state a cause of action against it and the defendant, Village of Ilion, moved for summary judgment, pursuant to CPLR 3212. In denying both motions the court stated (51 Misc 2d 130, 137-138):
"The picture presented here is one of constant threats, violence and harassment adequately and frequently brought to the attention of the village authorities in Ilion and Frankfort with no effective action taken by either of them.
"The plaintiff was a person to whom a special duty of care was owed (Baker v. City of New York, 25 A D 2d 770 [2d Dept., 1966]). Whether the assault which resulted in the girl’s death was reasonably foreseeable following a violation of probation also presents a question of fact for the jury. (Ben-way v. City of Watertown, 1 A D 2d 465 [4th Dept., 1956].)
* * *
"The complaint sets forth facts sufficient to constitute a cause of action against the Village of Frankfort. Accordingly, its motion is denied.
"The Village of Ilion’s motion for summary judgment is denied because this court has found issues of fact raised in the moving papers.”
Canosa v City of Mount Vernon (NYLJ, Feb. 18, 1965, p 17, col 6) involved an action commenced against the City of Mount Vernon by the estates of the decedent wife and four *459 other persons who were shot and killed by her husband and by two injured persons who survived. All of the causes of the action were combined in one complaint containing 12 separate causes of action. It appeared that the decedent wife, Delores Hansen and Charles Hansen were married in 1958 and separated in 1961, after which time she lived in Mount Vernon. At various times during the separation and up to April, 1963, the wife was threatened and assaulted by her husband and she reported these facts to the Mount Vernon police who took no action. On April 6, 1963, the husband appeared in front of the wife’s home and created a disturbance. He was arrested and taken to the police station, where within the hearing of the police officers, he threatened to murder his wife and members of her family. The police refused to hold the husband in custody or to furnish the wife with protection. On the following day, the tires on the wife’s car, which was parked in front of her home, were found to be slashed. The wife again asked that her husband be arrested and the police refused. The next morning, the husband, in some manner, entered the wife’s home, where he shot and killed his wife, his child, both of his wife’s parents and one of her brothers and he also shot and wounded two other brothers-in-law. The action was brought against the City of Mount Vernon on the theory that the city, acting through its police department, was negligent in failing to apprehend a man who was openly threatening violence and in failing to furnish the victims with reasonable protection. The defendant, City of Mount Vernon, moved to dismiss the complaint for failure to state a cause of action. The court denied the defendant’s motion to dismiss the complaint, stating: "The court can see no significant difference between this case and Schuster v. City of New York (5 N.Y. 2d 75). * * * Of course, there are some differences in the facts of the two cases. In the Schuster case, the decedent, acting as a public-spirited citizen, gave the police information leading to the arrest of a criminal of national reputation * * *. Here, the decedent went to the Police, not as a person interested in abstract law enforcement, but as a woman justifiably fearful of her own life and the lives of members of her own family. * * * This Court cannot see why an informer should be entitled to more police protection than a threatened victim, or why the failure to furnish such protection should not be as actionable in one case as in the other”.
In 1960 the Law Revision Commission of the State of New *460 York published its "Recommendation and Study Relating to Power of the Children’s Court and the Domestic Relations Court of the City of New York to Issue Orders of Protection” (NY Legis Doc, 1960, No. 65[D]). Describing the nature and function of orders of protection, the commission stated, at page 25 of its study (1960 Report of NY Law Rev Comm. p 141): " 'Orders of protection’ as embodied in the Domestic Relations Court Act, in which 'orders of protection’ originated, have certain advantages in keeping with the spirit of the sociological approach of the Children’s Court and Family Court legislation. The 'orders of protection’ provisions of the Domestic Relations Court Act are non-criminal and non-punitive. They are rather preventive and curative in their purpose. Moreover they have the advantage, for a court of limited jurisdiction, of specifically prescribing the areas of court action and court jurisdiction. Within the framework of the Domestic Relations Court Act such orders are also readily enforcible and therefore provide a form of poor man's equity, for the act includes a provision requiring any peace officer to whom a certiñcate of an order of protection is exhibited to arrest the person charged with violation of the order and to aid in affording the person obtaining the order the protection which the order intended.” (Emphasis supplied.)
Baker v City of New York (25 AD2d 770, 771-772) involved an action to recover damages for personal injuries allegedly suffered through, in part, the negligence of the defendant, City of New York. At the close of the plaintiff’s case, the trial court dismissed the complaint and the plaintiff appealed. The Appellate Division reversed the judgment on the law and granted a new trial, stating in part: "Plaintiff * * * was shot and seriously injured by her husband in the waiting room of the former Domestic Relations Court of the City of New York on November 2, 1955. Plaintiff and her husband were estranged. An order of protection of the Domestic Relations Court (which had been made on July 14, 1955), had directed the husband 'not to strike, molest, threaten or annoy’ the plaintiff. Moreover, that court had given plaintiff a certificate of the issuance of the order, which certificate provided that, upon its presentation by plaintiff to any peace officer, the latter would be authorized to arrest the husband for violation of the terms of the order and to aid plaintiff * * * There was evidence that sometime in October, 1955 the husband had created a disturbance at the family home, that a police officer summoned by *461 plaintiff investigated and refused to take action against the husband, even though the certificate of the order of protection was shown to him by plaintiff, saying that the certificate was 'no good’ and 'only a piece of paper.’ These events were narrated to Thomas Painter, a probation officer attached to the Domestic Relations Court. On the day of the shooting plaintiff went to see Painter, who told her that her husband was ill and could not come to court. While making a telephone call in the corridor, plaintiff observed her husband entering the building and told Painter that her husband was present. She asked Painter whether she could not wait in his office, saying that she was 'afraid to stand in the room with him.’ Painter told her, instead, to go to the waiting room. Although police officers and attendants were assigned to the court, none of them were in the waiting room then or up to 15 or 20 minutes thereafter, when the shooting took place. In our opinion, plaintiff’s proof made out a prima facie case. A municipality may not be held liable for failure to provide general police protection (Murrain v. Wilson Line, 270 App. Div. 372, affd. 296 N. Y. 845), but there may be liability if there exists on the part of the municipality 'some relationship * * * creating a duty to use due care for the benefit of particular persons or classes of persons’ (Motyka v. City of Amsterdam, 15 N Y 2d 134, 139; cf. Schuster v. City of New York, 5 N Y 2d 75, 80-81; Farmer v. City of New York, 23 A D 2d 638). Plaintiff, we think, was a person recognized by the order of protection as one to whom a special duty was owed. The order of protection was issued by the court pursuant to statute (former Domestic Relations Ct. Act, § 92, subd. [7]); and the certificate with which plaintiff was furnished constituted authority to a peace officer, when presented by the plaintiff, to arrest the husband when charged with a violation of the terms of the order (former Domestic Relations Ct. Act, § 126). The order of protection, though a relatively new invention in the law (note, 25 Albany L. Rev. 172), was intended both as a remedial and preventive arm of the former Domestic Relations Court (Use of Protection Orders in Family Court Disputes, 2 Columbia Journal of Law and Social Problems, No. 3, p. 1). Plaintiff was thus singled out by judicial process as a person in need of special protection and peace officers had a duty to supply protection to her. Painter was a peace officer (former Domestic Relations Ct. Act, § 25). It is consequently a question of fact for the jury whether Painter, during the incidents of November 2, 1955, or the police officer to whom *462 plaintiff had turned during the previous episode in October when the husband was causing a disturbance were negligent in discharging the duty of special protection to plaintiff (cf. Middleton v. Whitridge, 213 N. Y. 499, 510-511; Scarff v. Metcalf, 107 N.Y. 211, 215; Dunham v. Village of Canisteo, 303 N.Y. 498). * * * the question of proximate cause is a matter for the jury (Lubelfeld v. City of New York, 4 N Y 2d 455, 460; McCrink v. City of New York, supra, p. 106). For these reasons, a new trial is granted.”
In its reply affirmation filed in support of the instant motion to dismiss, the defendant concedes that the key case is Baker and that Baker is the law to be applied. The defendant then seeks to limit Baker (25 AD2d 770, supra) to the person named in the certificate of order of protection. The defendant argues that in Baker the plaintiff was the person for whose benefit the order of protection was issued whereas in this case plaintiff Josephine Sorichetti, who was not injured, was the person named in the order who needed the protection, and not the victim Dina Sorichetti. Assuming, although I do not so find, that the defendant applies Baker correctly, it nevertheless overlooks the fact that in this case, similarly as in Baker, there was more than one violation of the order of protection by the husband. The first violation occurred on Saturday morning, November 8, 1975, when the infant was turned over to Frank Sorichetti, at which time he made a death threat against his wife and the infant and he indicated that before the weekend was up his wife would be making the "sign of the cross” which to them meant that there would be a death. This constituted a violation of the order forbidding Frank Sorichetti to "menace, harass, threaten or act in a disorderly manner toward petitioner”. When Josephine Sorichetti immediately reported this violation to the police officers at the 43rd Precinct and showed the certificate of the order of protection and demanded that the police take Frank Sorichetti into custody for the violation of the order, the police "had a duty to supply protection to her” (Baker, 25 AD2d 770, supra). Had the police taken Frank Sorichetti into custody for violating the terms of the order and brought him before the court as the certificate provided, then the tragic events of the following day, in all probability, would not have occurred. It is consequently a question of fact for the jury whether the police to whom Josephine Sorichetti turned for help on November 8 were negligent in discharging the duty of special protection to Josephine Sorichetti.
*463 The second violation of the order of protection occurred beginning at 6:00 p.m. on Sunday, November 9, when Frank Sorichetti failed to return the infant as required by the order. Again the police were repeatedly informed of the violation, shown the order and requested to do their duty; the failure of the police to act at that time similarly presents a question of fact for the jury whether the police were negligent in so doing.
This court deems it significant that the Baker court held that the failure of the police to act after the first violation in October, a considerable time prior to the second violation in November, presented a question of fact for the jury whereas in this case the two violations were only one day apart.
Further, this court does not accept the defendant’s argument that only Josephine Sorichetti was entitled to the benefit of the order of protection. Assuming, in Baker (25 AD2d 770, supra) that the husband fired at his wife, but the bullet struck a bystander or Mrs. Baker’s child instead, would those victims be without a remedy against the City of New York? Or, in Schuster (5 NY2d 75, supra) suppose a member of the family had been the victim rather than the informer to the police, would the Court of Appeals have held differently? In Canosa (NYLJ, Feb. 18, 1965, p 17, col 6, supra) the husband’s threats and assaultive conduct were directed at the wife, yet the court denied the motion by the City of Mount Vernon to dismiss the causes of action brought by the estates of the other victims who were killed and by the other victims who survived. Again, assuming the wife had not also been a victim, would the decision of Justice Dillon be otherwise? The answer in each of these instances must be in the negative.
The "Manual For Police in the State of New York” (revised as of Sept. 1, 1974), which is "Prepared and published by the New York State Police as a service to Law Enforcement in the State of New York” recognizes the obligation and authority of a peace officer to act when a violation of an order of protection is reported to him. As stated on page 108 of the manual: "At the conclusion of hearings on a family offense petition, the court may dismiss it, suspend judgment, place the offender on probation or make an 'order of protection’. This is an order setting out conditions of behavior to be observed by the offender, or the petitioner or both (FCA Secs. 841, 842). If such an order is made, a 'Certificate of Order of Protection Issued’ may be issued by the clerk of the Family Court to any person affected and the presentation of this certificate to any *464 peace officer constitutes authority for him to take into custody a person charged with violating the terms of the order of protection and to bring the person before the court. The officer must, so far as lies within his power, aid in securing the protection the 'order of protection’ was intended to afford (FCA Sec. 168)”. (Emphasis supplied.)
Notwithstanding the clear purpose and intent of the statute (Family Ct Act, § 168) and the duty of the police to act when a violation of an order of protection occurs, as they have been instructed throughout the State by the aforesaid "Manual for Police, etc.”, the New York City Police Department apparently has heretofore ignored the statute and has not instructed its police officers regarding the statute or their duties and responsibilities under the State law. The New York City Police Department Manual, unlike the manual prepared by the New York State Police, is devoid of any statements, comments or instructions to New York City police officers with respect to violations of orders of protection.
On the contrary, it has been claimed, with some success, that the New York City Police Department has a policy of refusing or failing to arrest husbands who have menaced, harassed, threatened, endangered, assaulted and beaten their wives, solely because the victims happen to be married to their assailants. In December, 1976 a suit was instituted in the New York County Supreme Court by 12 "battered” wives (Bruno v Codd, 90 Misc 2d 1047) on behalf of all similarly situated women in New York and Kings Counties, seeking adjudication and vindication of their rights under State law, by way of declaratory and injunctive relief, to police assistance and protection. The 103-page complaint set forth seven causes of action; the plaintiffs making the legal claim, among others, that the police may not fail or refuse to arrest husbands who have violated previously obtained orders of protection. The police department defendants moved to dismiss the complaint for failure to state a cause of action and the other defendants also cross-moved to dismiss or alternatively for summary judgment.
By opinion dated July 5, 1977 Justice Gellinoff denied the motions to dismiss. The court rejected the claim of the police defendants that the plaintiffs were seeking to abolish the traditional discretionary power of the police, stating that the police defendants "miss[ed] the point of the complaint” by failing to recognize that the plaintiffs were only seeking to *465 compel the police to exercise their discretion and "not to automatically decline to make an arrest solely because the assaulter and his victim are married to each other.” (Bruno v Gold, 90 Misc 2d 1047, 1049, supra.) Continuing, Justice Gellinoff held (at pp 1050-1051):
"This court has the power to compel the Police Department defendants to perform the duty imposed upon them by law to exercise their discretion, and to exercise it in a reasonable, non-arbitrary manner (see, Matter of State Soc. of Professional Engrs. v Education Dept. State of N. Y., 262 App Div 602, 604; Matter of City of Schenectady v New York State OffTrack Pari-Mutuel Betting Comm., 69 Misc 2d 929, revd on other grounds, 39 AD2d 983; Matter of 1350 6th Ave. Corp. v Department of Housing, 197 Misc 982, 984). And the police owe a duty of protection to battered wives, in the same manner they owe it to any citizen injured by another’s assault, notwithstanding the fact that primary jurisdiction for adjudication as to such assaults lies with the Family Court rather than the Criminal Court (cf., People v Brady, 54 Misc 2d 638; People v Hebmann, 54 Misc 2d 666). Indeed, it has been held that women armed with orders of protection are owed 'a special duty’ of protection by the police (Baker v City of New York, 25 AD2d 770, 771).
"The plethora of papers submitted by plaintiffs are more than adequate to create a factual issue as to whether there is a failure by the police to perform their duty of providing persons in plaintiffs’ position with proper police service, by pursuing a discriminatory police policy. For this reason, the Police Department defendants’ motion for summary judgment dismissing the complaint must be denied.”
The defendants appealed to the Appellate Division, but thereafter in June, 1978 while the said appeal was pending, the various police defendants, including the present Police Commissioner Robert McGuire, entered into a consent decree with the plaintiffs wherein, among other things, the said police defendants stipulated that:
"2) The Police Department and its employees have a duty to and shall respond to every request for assistance or protection from or on behalf of a woman based on an allegation that a violation or crime, or a violation of an Order of Protection or Temporary Order of Protection, has been committed against her by a person alleged to be her husband, whether the request be in person or by telephone to '911’ or to a precinct, *466 by sending one or more police officers as soon as possible to the scene.
* * *
"4) Where there is reasonable cause to believe that a husband has committed a felony against his wife and/or has violated an Order of Protection or Temporary Order of Protection, the officer shall not attempt to reconcile the parties or mediate and the officer shall arrest the husband.
* * *
"6) In any instance where a wife or someone on her behalf charges, within the meaning of Family Court Act Section 168, that a husband has violated an Order of Protection or Temporary Order of Protection, it is the responsibility of a police officer to, and the officer shall, arrest the husband provided that the officer finds that reasonable cause exists for the officer to believe that the conduct charged is within, the scope of such Order, and that the husband has committed the alleged act.
* * *
”7) A police officer who arrives at the scene of an alleged crime or violation, or violation of an Order of Protection or Temporary Order of Protection, by a husband against his wife, has the responsibility to, and the officer shall, remain at the scene temporarily in order to terminate or prevent the commission of any crime or violation, or violation of an Order of Protection or Temporary Order of Protection, against the woman.
* * *
"13) The Police Department shall amend or rescind, as necessary, all Police Department regulations, memoranda, training materials, guides and other Police Department documents which in any way refer to its policies, practices, and procedures so as to conform them in all respects to all provisions of this consent decree.
* * *
"15) The Defendant Police Commissioner and his successors in office shall take all steps necessary to fully apprise all employees of the New York City Police Department of the terms and obligations of the within consent decree.”
The consent decree in Bruno v Codd (90 Misc 2d 1047) indicates a recognition and acknowledgment by the defendant *467 City of New York and its police department of their obligations and duties and that they will hereafter instruct their police officers with respect to the statute and of their obligations and duties under section 168 of the Family Court Act.
However, even assuming that the order of protection issued to Josephine Sorichetti did not include nor protect the infant herein there is presented a question of fact for the jury whether the police, in light of the existing facts known to them or brought to their attention by Josephine Sorichetti, were negligent in failing to take the necessary action to protect the infant plaintiff. (Schuster, 5 NY2d 75, supra; Jones, 51 Misc 2d 130, supra; Canosa, NYLJ, Feb. 18, 1965, p 17, col 6, supra.)
Defendant’s reliance on Riss v City of New York (27 AD2d 217, affd 22 NY2d 579) is misplaced. In Riss, the plaintiff had been threatened over a long period of time by a disappointed suitor who was a lawyer in good standing. The majority opinion stated (at pp 218, 219):
"Here the evidence shows that the police were told of the actions of a disappointed suitor who, it is true, made extravagant threats. In addition, they were told of certain incidents which might be construed as activating those threats, though actual proof of the perpetration of these acts by the one threatening was lacking. They were confronted with the fact that the person accused was a lawyer in good standing, and that when the plaintiff made a charge against him in court it was withdrawn on the hearing. It must be common knowledge that unfavored swains are not infrequently tempted to relieve their frustrations by predictions of dire results to the object of their attentions; and that the timorous make frequent applications for protection for this, as well as a variety of other reasons, real or imagined. It would not only be impracticable but impossible to protect against all these contingencies.
"Here, events proved the police to be wrong. The suitor was either so depraved or demented that he carried out his threats in a manner that can only evoke revulsion to himself and the greatest pity for his victim. But this is not to say that there was negligence in failing to foresee these consequences. Otherwise, in every case of reported threat the police would have to determine the probability of injury at their peril. It is submitted that the facts brought out on this trial do not show the presence of such imminent danger that extraordinary police activity was so indicated that the failure to take it can be *468 deemed unreasonable conduct. The balancing factors, plus the fact that complaints continued over a considerable period without active implementation by dangerous conduct, negate the contention that the failure to afford personal protection in excess of that accorded to members of the community generally was negligence. Something in addition by way of proof of an immediate danger would have to be shown.”
Unlike Riss (27 AD2d 217, affd 22 NY2d 579) where the court found that the alleged wrongdoer was a lawyer in good standing, the assailant in the instant case was already well known to the police of the 43rd Precinct, having a record of some six prior arrests for drunkenness, abusive and physical assaults on his family, including an assault with a knife during which he inflicted lacerations on his wife which required suturing at Jacobi Hospital; in fact the issuance of the order of protection, even if only for the benefit of Josephine Sorichetti, had already judicially determined that Frank Sorichetti had previously committed crimes or offenses which made him a dangerous threat.
Unlike Riss where the court found only that the police were informed of extravagant threats by a disappointed suitor continuing over a considerable length of time without active implementation by dangerous conduct, there was knowledge by the police in the instant case that Frank Sorichetti had in fact previously committed assaultive acts and was dangerous.
Unlike Riss, where the court found that the plaintiff had previously made a charge against the alleged wrongdoer and then withdrew it on the hearing, the charges against Frank Sorichetti in the instant case had already been heard and determined against him in the Family Court when the order of protection was made permanent.
Unlike Riss, where the court found that something in addition by way of proof of an immediate danger would have to be shown, the facts known to the police in the instant case indicated most strongly the threats of death by Frank Sorichetti and the immediate danger to the infant. Further, with knowledge of the threats, the police in the instant case were put on notice that Frank Sorichetti violated the order when he failed to return the infant at 6:00 p.m. on November 9.
In his concurring opinion in Riss (27 AD2d 217, 219), Justice McNally stated: "On this record there was no legal basis for an arrest prior to the alleged assault. Moreover, plaintiff did not seek protection, except as an incident of the arrest and *469 detention of the threatener.” In this case there was a legal basis for the police to arrest Frank Sorichetti prior to the assault on his infant daughter. Moreover, the plaintiff Josephine Sorichetti did seek protection for herself and for her infant daughter.
This court finds that the complaint sets forth facts sufficient to constitute a cause of action against the defendant, the City of New York. Accordingly, the motion to dismiss the complaint is denied.